Filed 5/8/23  In re Z.T. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.T., a Person Coming Under the Juvenile Court Law. | D081278 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.M., <br><br> Defendant and Appellant. | (San Diego County Super. Ct. No. J521106) |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa Maldonado, Chief Deputy County Counsel, Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

E.M. (Mother) appeals a dispositional order in a Welfare and Institutions Code section 300[1] dependency proceeding pertaining to her daughter, Z.T. Mother contends that there was no substantial evidence supporting the juvenile court's order removing Z.T. from her custody under section 361, subdivision (c). We disagree and affirm the court's order.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Background Information*

Mother and D.T. (Father)[2] have been dating since approximately January 2019. Z.T. is their first and only child together. They engaged in several domestic violence incidents throughout their relationship, including during Mother's pregnancy with Z.T. Criminal Protective Orders (CPOs) currently protect Mother and her mother (maternal grandmother) from Father until September 2024.

B.    *Mother's Psychiatric Holds*

At Z.T.'s birth in November 2021, Mother was aggressive, violent, and refused to push while in active labor. She yelled at medical staff and refused their assistance. She expressed thoughts of suicide after Z.T. was born. Maternal grandmother told hospital staff that Mother had been diagnosed with bipolar and schizoaffective disorders but was not taking any medication.

Medical staff placed Mother on a section 5150 hold due to her aggressive and psychotic behavior and intermittent explosive disorder. A doctor diagnosed her with bipolar disorder, schizoaffective disorder, and/or a

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Father "did not comply" with the court-ordered paternity test. Nevertheless, to simplify, we refer to him as "Father" because Mother reports he "is the biological father of [Z.T.]" He is not a party to this appeal.

substance use disorder with a history of panic attacks, generalized anxiety disorder, obsessive-compulsive disorder, post-traumatic stress disorder, and eating disorders. Mother complied with taking her medication while she was on the psychiatric hold and her intermittent explosive disorder improved. She no longer exhibited signs of aggression or similar behavior.

The San Diego County Health and Human Services Agency (Agency) investigated this incident but closed it as "unfounded" because Z.T. was unharmed, Mother's behavior stabilized, and her support network reported that she was attentive and meeting Z.T.'s needs. The Agency conducted a Child and Family Team (CFT) meeting, and Mother refused voluntary services.

A few months later, in March 2022, maternal grandmother called the Psychiatric Emergency Response Team (PERT) due to concerns Mother was a danger to herself and others after she was seen carrying a large knife around the house. She was again placed on a section 5150 hold because she appeared paranoid, delusional, and irritable and made bizarre statements.

Maternal grandmother said Father encouraged Mother to stop taking her medication for more than a week. The doctor counseled Mother on the need for psychotropic medication and "the critical importance of stopping cannabis use as it is likely contributing to her symptoms." During the 5150 hold, with "time for medication management and time to metabolize substances," Mother's mental status improved. Mother left the hospital when the hold expired despite the medical staff's recommendation she remain voluntarily for "further stabilization and care." The Agency investigated this incident and determined the allegation of general neglect was "inconclusive" because Z.T. "was not hurt" during Mother's "manic episode," and there was "not enough evidence to substantiate a finding."

C.     *The Agency's Child Abuse Hotline Referral*

On September 9, 2022,[3] the Agency received an anonymous referral on its child abuse hotline alleging that Mother and Father were ignoring Z.T.'s basic needs while "smok[ing] in the room with [her] present" and exposing her to cockroaches, mold, and marijuana "everywhere." The referring party suspected the parents were violating the CPO and that Mother was "off her medication for two weeks because she is angry, curses at [maternal grandmother], and [Mother and Father] have been arguing often while [Z.T.] is in the room, things could be heard being thrown around."

D.     *The Agency's Investigation into the September 9 Incident*

Following the referral, the Agency interviewed Grandmother and learned that she heard a " 'loud thump' " coming from Mother's bedroom on September 9, as if Father "threw [Mother] against the wall or floor." She heard Mother crying and yelling at Father, " 'I'm tired of you and my mom beating me.' "[4] Maternal grandmother opened the bedroom door and saw Mother holding Z.T., who was crying. Another relative, the maternal aunt, took Z.T. away. Father left the home after the maternal grandmother told him to leave, but he returned the next day after Mother begged him to come back. Maternal grandmother confirmed there were cockroaches, trash, and mold throughout Mother's bedroom, including on Z.T.'s crib and clothing, and that she found illicit mushrooms in Father's duffle bag and marijuana next to Z.T.'s crib. She explained that Mother typically smoked marijuana from a "bong" in her bedroom and bathroom.

---

[3]     This incident hereinafter is referred to as the "September 9 incident."

[4]     Maternal Grandmother denied hitting Mother.

4

Mother admitted in her initial interview with the social worker that she was in contact with Father, but she then recanted and said that she would not have contact with him until the CPO was lifted. She said they were not separated, and she planned to live with him once the CPO was lifted, even though he had previously strangled her. She also initially denied having a "bong" or engaging in any substance abuse, but later admitted she owned the "bong" and smoked marijuana. She denied using marijuana in Z.T.'s presence.

As maternal grandmother was being interviewed by the social worker outside, she told the social worker that Father was inside the home. Mother tried to hide Father from the social worker. When Father eventually emerged from a room, he told the social worker he was a family friend named "Christopher." He denied he was Father, refused to speak with the social worker, and left the house. Mother also denied he was Father and, appearing nervous, got in her car and left. Maternal grandmother and the maternal aunt both confirmed he was, in fact, Father.

The next day, Mother called the social worker to apologize. She admitted the man who identified himself as Christopher was actually Father. Mother knew she was not abiding by the CPO but felt she was in danger, saying: " 'He was keeping me hostage, he doesn't let me break up with him.' " Although she denied Father would hurt her if she remained with him, she said he held her against her will and she would be in danger if she left him. She said Father physically " 'beat' " her every day before Z.T. was born and that " '[h]e could have killed me.' " She said he raped her in a vehicle when Z.T. was conceived. She believes Z.T.'s birth saved her life. Nevertheless, Mother said she forgave Father.

Mother acknowledged she was diagnosed with bipolar disorder in 2016, that she was hospitalized three times, and prescribed medication. Even so, she denied having a mental health disorder and indicated she plans to sue the doctors for the incorrect diagnosis. She stopped taking medication for two years when Father " '[k]idnapped' " her, and they lived together. Since Z.T. was born, she had been taking her medication daily and will continue to do so as long as she lives in maternal grandmother's home because maternal grandmother gives it to her every night. Mother denied being off her medication recently and instead accused maternal grandmother of losing the medication for a couple of days.

Mother's treating psychiatrist was unable to fully assess Mother's condition due to the " 'uncooperative nature of phone visits.' " The psychiatrist noted her " '[c]ompliance [with] treatment is unclear' " and that she has a " 'verbally attacking/angry tone of voice" on the phone.

Mother's aunt reported that when Mother fails to take her medication, she " '[g]ets all crazy,' " says someone is spying on her, curses and yells, does not sleep, takes her anger out on maternal grandmother and demands that she " 'stay the hell away from' " Z.T. On the other hand, when Mother takes her medication, she apologizes to everyone and " '[is] a super mom, loving, caring, respectful, cooks for [Z.T.]' " and is " 'a total[ly] different person.' " Because she fears Mother would take Z.T. and not return, and Father would hurt Mother, the Mother's aunt believed maternal grandmother should have guardianship of Z.T.

Z.T.'s paternal step-grandfather reported he had seen Father with black eyes, stab wounds, and a broken nose caused by Mother, although Father did not file a police report. According to the paternal step-grandfather, Father was a " '[s]weetheart, he has never hurt a fly.' " Mother,

6

on the other hand, was a " 'psychopath' " who would eventually hurt Z.T. when not on her medication. The paternal grandmother similarly reported that Mother had stabbed Father. She said Mother was rude and disrespectful when not taking her medication, but she was respectful and kind when she was taking it.

Father eventually agreed to speak to the social worker. He explained that Mother argues a lot and believes someone is watching her when she does not take her medication, which is what happened for four days recently. He acknowledged visiting and staying overnight at maternal grandmother's house since May 2022. He knew this violated the CPO, but he was feeling stressed, overwhelmed and wanted to be with family after his mother moved to another state.

Father denied any physical confrontation on September 9, but acknowledged past domestic violence with Mother. He said it started one year into their relationship when Mother began to punch, push, throw objects, and even tried to hit him with a hammer. In 2020, he said, she showed up angry to a restaurant where he was eating with family and coworkers. He claimed she hit him with her cellphone and gave him a " 'purple eye.' " Paternal great-aunt corroborated the story. Father admitted he eventually became physical with Mother, as he " 'exploded' " and slapped her on the mouth when she would not stop yelling at him. Another time, they were arguing so long that he " 'couldn't take it anymore.' " He slapped her on the face, which gave her a black eye, grabbed her by the neck and tried to push her out of their car, though he denied trying to hurt or choke her.

Although Mother liked to smoke marijuana, and she sometimes left Z.T. in Father's care while she smoked in the bathroom, Father denied using drugs or alcohol and denied that any substances or paraphernalia were

accessible to Z.T. When the social worker asked Father about the illicit mushrooms in his duffel bag, he explained that Mother received them for free when she ordered marijuana, and he thought about giving them to a friend. He nevertheless declined to take a drug test, participate in voluntary services, or develop a safety plan to ensure Z.T.'s safety.

The Agency developed a safety plan with Mother, maternal grandmother, and the maternal aunt. The Agency determined the plan was temporary and did not create long-term safety for Z.T. because of the family's demonstrated pattern of violating the CPOs and Mother's failure to consistently follow up.

E.     *The Agency's Petition*

On September 20, 2022, the Agency filed a request for a protective custody warrant and a juvenile dependency petition alleging that Z.T. was a child described by section 300, subdivision (b)(1). The petition alleged an "ongoing pattern of domestic violence" in which both parents acted as the aggressor, including the September 9 incident and other incidents that involved throwing objects, hitting, and grabbing by the neck. Additionally, Father lived in maternal grandmother's home for two months in violation of the CPO. The petition also discussed Mother's diagnosis of multiple mental health conditions, including bipolar disorder, and that she was "in denial regarding her diagnosis" and had not taken her medication consistently. It alleged the parents' ongoing pattern of domestic violence and Mother's untreated mental health conditions placed Z.T. at substantial risk of serious physical harm due to their failure or inability to adequately supervise and protect her. The court granted the Agency's request for a protective custody warrant and set the matter for a detention hearing.

F.    *The September 2022 Detention Hearing*

The court made a prima facie finding that Z.T. was a child described by section 300, subdivision (b) in that she was "certainly at risk of serious bodily harm due to—or emotional harm as well due to the unmitigated or improperly addressed or insufficiently addressed mental health concerns, marijuana usage, and domestic violence in the presence of the child."  It further found that continuance in maternal grandmother's home was contrary to Z.T.'s best interests.  Reasonable efforts, including the offer of prior services to Mother, had been made, but those efforts were unable to mitigate the protective issue or "create a safe and protective environment at this time."  In other words, the "parents have not been able to alleviate the danger to [Z.T.]" and there are "no reasonable means to protect" Z.T. in their custody.  Thus, the court ordered Z.T. detained with the maternal great-aunt and granted voluntary services for the parents with liberal supervised and separate visitation.

G.    *The Agency's Jurisdiction and Disposition Report*

By the middle of October 2022, Z.T. remained at maternal great-aunt's home.  Neither the Agency nor Father's probation officer knew Father's whereabouts.  The Agency searched for Father but was unable to locate him.  The probation officer said a warrant would be issued for Father's arrest because he was no longer in compliance with the terms of his probation.

In her follow-up interview, Mother appeared irritated and voiced her concern that the Agency was involved in her life for no reason.  Mother claimed the petition was " 'all lies,' " and initially denied she and Father ever lived together in maternal grandmother's home, or that they had an altercation on September 9 or ever engaged in domestic violence.  She stated, " 'I actually want to deny ever giving you or the last social worker any

9

statements at all.' " Although Mother eventually acknowledged having bipolar disorder, she said she took medication to appease everyone. She did not believe her medication was helpful or that her disorder affected her parenting. She thought smoking marijuana weekly helped "a small amount" with a medical condition and she would quit if necessary to reunify with Z.T.

Mother once again discussed how Father physically abused her before Z.T. was born. She initially said he strangled her only once, but later confirmed it happened more than once. She did not know how often. He also hit her " 'a lot,' " although she did not recall how often. She denied ever fighting back and said she could not remember ever hitting Father. She denied recent domestic violence, that Father had " 'done anything wrong at all' " since Z.T. was born, or that they violated the CPO. A couple of days later, however, Mother admitted she had contact with Father in violation of the CPO on September 9 in maternal grandmother's home, but she again denied any violence.

Paternal grandmother informed Mother that Father fled to Mexico and did not plan to return. Because Mother did not want to " 'self-incriminate,' " she refused to disclose whether she had Father's contact information. She denied recent communication or that she planned to continue their romantic relationship, despite being sad that he left the country. She was not afraid of him or future violence.

 In maternal grandmother's follow-up interview, she was uncertain whether the September 9 incident involved physical abuse, but she believed Father harmed Mother based upon the noise and their history of domestic violence. Mother had black eyes, marks, and bruises on numerous occasions and Mother always named Father as the perpetrator. She understood that she should not have violated the CPOs and should have contacted law

10

enforcement. She also clarified that Mother smoked marijuana only in the bathroom or outside. She did not smoke in front of Z.T. She was very worried about Z.T. and was glad the Agency intervened so Mother would have assistance to get her life back on track. Mother had many very good parenting skills and was healthier and happier without Father. The parents' fights exacerbated Mother's mental health symptoms and Father encouraged her to stop taking her medication.

The maternal great-aunt reported that Mother visited Z.T. several times per week, providing money for baby supplies, and calling daily to check on Z.T. She believed Mother was doing very well while stabilized on her medication, and was taking the situation very seriously. She said Mother always seemed to do better when Father was not around.

Father called the social worker and stated he was in Mexico and would not be returning to California. His probation officer learned he had been living with Mother in maternal grandmother's home, and warned him that he could go to prison for up to three years and then be deported if he violated the CPO. Father declined to provide the social worker with his address, living circumstances, or any more information until he knew whether he could gain custody of Z.T. while residing out of the country. He did not know if he planned to attend the next court hearing because he did not see how it would benefit him or Z.T. The social worker's additional efforts to contact him were unsuccessful.

The Agency continued to recommend Z.T. be removed from Mother's custody. The parents needed to demonstrate over time that they could safely parent Z.T. and meet all her basic needs without exposing her to marijuana, environmental hazards, and domestic violence. Mother had agreed to follow the CPO, but she failed to do so and struggled to set boundaries with Father.

Mother's severe mental health issues also posed a risk to Z.T., yet she denied any mental health diagnoses other than bipolar disorder and minimized her mental health issues despite a history of section 5150 hospitalizations. She had not seen a psychiatrist for long enough to be assessed thoroughly enough to receive a proper diagnosis.

### H. Initial Jurisdiction and Disposition Hearing

At an initial jurisdiction and disposition hearing in October 2022, Mother set the matter for a contested hearing, primarily on the issue of the removal of Z.T. from her custody.

### I. The Agency's Addendum Report

Before the contested hearing in November 2022, the Agency submitted an addendum report. Mother's family support clinician noted Mother was irritable and anxious and exhibited paranoid and delusional thought processes at times. Mother had significant trauma in her past, and she reported it was too difficult to talk about past domestic violence incidents with Father. With regard to domestic violence, she was assessed to be in the "contemplation" stage of change. She was aware her relationships had issues but she still struggled to identify how domestic violence dynamics and trauma affected those relationships and Z.T. For mental health, Mother scored in the "pre-contemplation" stage of change because she lacked awareness of her behavior when she was delusional and emotionally dysregulated. She also lacked awareness of how her dysregulated, delusional behavior led others to feel unsafe.

The clinician recommended additional mental health services for Mother, including psychiatric services, therapeutic counseling, a neuropsychological assessment, and mental health case management services. Mother was open to individual therapy, and, by November, began

12

participating in a domestic violence victim group, in-home parenting sessions, and parent partner meetings. She reported being compliant with her medication, denied any contact with Father and denied any substance abuse issues. Overall, the Agency assessed Mother to be in the early stages of treatment to address her mental health, parenting, and domestic violence.

### J. Contested Jurisdiction and Disposition Hearing

At the November 2022 contested jurisdiction and disposition hearing, Maternal grandmother admitted she had allowed Father to have extended visits in her home of up to a few days because she was afraid he was going to kill Mother by first convincing her to leave with him and Z.T. She "finally" called the Agency after she started seeing him very often. Mother argued with her when she told Mother she did not want Father in her home. Maternal grandmother also testified that Mother refused to take her medication when she was around Father, including while they were in her home.

Mother's counsel argued Z.T. should be released back to Mother's custody on the condition that she reside in maternal grandmother's home. While acknowledging "the home is not perfectly safe," Mother's counsel argued there was not clear and convincing evidence removal was necessary to protect Z.T.

After hearing argument from all counsel, the juvenile court adopted the Agency's recommended findings and orders. The court stated, "This is not about [maternal grandmother.] She is a strong woman who is clearly capable of doing everything she needs to do to protect herself or protect her daughter and her granddaughter." Rather, the court determined this is a case involving a "long history of domestic violence with an abusive man" who is "sneaky" and "violent." Father "has a history of beating [Mother]," has "no

13

regard for court orders" and there was insufficient evidence the Mexican border and/or the outstanding arrest warrant would keep Father away from Mother or Z.T. Father had abused Mother while she had a CPO and was in the "safe home" of maternal grandmother. The maternal grandmother and maternal aunt "cannot be there all the time." The court found the allegations in the petition true by clear and convincing evidence.

Regarding Mother's request to have custody of Z.T. on the condition that she live in maternal grandmother's home, the court stated:

> "Unfortunately, this Court does not see that that is at this time a reasonable safe environment. Not because [maternal grandmother] can't protect, but I cannot, with confidence, say while she is away at work or [the maternal aunt] is doing whatever she may be doing, that this man would not somehow have contact with the still very vulnerable mother, who still can be pulled away, and has not yet gained the strength or insight to protect herself or [Z.T.] sufficiently."

Thus, "there is a substantial risk of danger . . . due to the control that [Father] still has and the violence that he still represents."

The court found that the Agency had made reasonable efforts to put a safety plan in place, such as safety planning, consideration or assessment of maternal grandmother, and holding CFT meetings. Nevertheless, there were "no reasonable means" to prevent the need for removal of Z.T. from Mother's custody until Mother had "gained insight to deal with Father . . . sneaking around." Thus, Z.T. remained placed in the approved home of a relative. The Agency could "continue to assess [maternal grandmother's] home as a potential placement" if it could increase the safety of the home by, for example, reducing the risk "as it relates to Father's access or potential access." The court ordered reunification services for Mother and encouraged her to focus on her recovery as a victim of domestic violence as well as her

14

mental health to build "the strength to be able to resist this sneaky man who places your life at risk and the life of [Z.T.]."

## DISCUSSION

Mother contends substantial evidence does not support the juvenile court's finding by clear and convincing evidence that: (1) there would be substantial danger to Z.T. if she were returned to Mother's custody; and (2) there were no reasonable means by which Z.T.'s physical health could be protected without removing her from Mother's custody. We disagree.

A.    *Legal Principles and Standard of Review*

To remove a child from the custody of the parent with whom the child resided at the time the petition was filed, the juvenile court must find by clear and convincing evidence that one of five grounds exists pursuant to section 361, subdivision (c). (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Of relevance here, "[o]ne ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child." (*Ibid.*, citing § 361, subd. (c)(1).)[5]

"We review a removal order for substantial evidence notwithstanding the clear and convincing standard used by the juvenile court." (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451.) In applying the standard, "we

---

[5]    Section 361, subdivision (c)(1) provides: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . ."

15

review the record in the light most favorable to the juvenile court's order to decide whether substantial evidence supports the order." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146–147.) "[W]e do not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence." (*Id.* at p. 146.)

The court has broad discretion to determine a child's best interest and to fashion a disposition order in accord with this discretion. (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) The paramount legislative purpose of dependency proceedings is the protection of the child. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214–1215.) Although section 361, subdivision (c), represents a legislative effort to maintain children in their natural parent's homes, such action is limited to situations where it is safe to do so. (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.)

The appellant has the burden of showing there is insufficient evidence to support the court's findings and orders. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) The existence of some support for a contrary conclusion is not enough to defeat the finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823.)

B.   *Analysis*

Mother contends that "[a]bsolutely no evidence was presented in this case, that [Z.T.] had suffered any harm as a result of the previous domestic violence incidents which victimized [Mother]." Her argument is misplaced. Z.T. was not required to have suffered actual harm before being removed. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918 ["a child does not need to be harmed before being removed from his parents' custody."].) In fact, "[o]ne of the goals of dependency is to protect a child *before the harm takes place*."

16

(*Ibid*., italics added.)  Here, it was reasonable for the court to infer that Z.T. would be at risk of harm if returned to Mother's care. The court's decision to remove Z.T. is "consistent with the purpose of section 361, subdivision (c), which is to prevent harm to children."  (*Ibid*.)

Notably, it was not Mother, but the maternal aunt and maternal grandmother, who intervened to protect Z.T. during Mother's fights with Father.  For example, during the September 9 incident, maternal grandmother heard a loud thump, screaming and crying coming from Mother's room.  When she asked the parents to open the door, she saw Mother holding Z.T. who was crying.  Z.T. was then taken away by the maternal aunt, while maternal grandmother asked Father to leave her home. Mother, on the other hand, begged Father to return.  There is no evidence in the record that Mother asked another adult to take Z.T. or otherwise demonstrated concern that Z.T. was present during her frequent fights with Father.

The record does not support Mother's claim that "the violent incidents took place prior to [Mother's] pregnancy."  On the contrary, there is substantial evidence Father inflicted life-threatening injuries on Mother in July 2021 while she was four-to-five months pregnant with Z.T.  According to statements made by Mother to the responding police officer, Father punched Mother several times in the head, slammed her head against a car and briefly strangled her.  In response to a police officer's question about the "visible injury to her right eye," Mother admitted Father "punched her in the eye." Maternal grandmother also reported that Mother had "two black eyes" from an incident which happened a couple of days earlier.

Mother asserts the court treated her unfairly because "[e]ven after a mother manages to distance herself from the abuser," the Agency and courts

"continue to use the history of domestic violence as a basis to remove the children." But here Mother has not taken action to distance herself from Father and instead has tried to protect him. For example, as Father hid in their car following a domestic violence incident in July 2021, Mother refused to cooperate with responding police officers. She was visibly upset and angry by the officers and kept challenging them to a fight. Mother also failed to contact law enforcement even though Father " 'beat' " her every day prior to Z.T.'s birth, and she felt, " '[Father] could have killed [her].' " In September 2022, Mother lied about Father's identity and attempted to direct the social worker away from maternal grandmother's bedroom, where Father was hiding. The next month, Mother refused to tell the social worker whether she had been in contact with Father or had current contact information because she did not wish to " 'self- incriminate.' " While we appreciate that victims of domestic violence often have difficulty separating from their abusers, the trial court properly focused on the safety of the child.

Mother's reliance on *In re I.B.* (2020) 53 Cal.App.5th 133, is misplaced. There, as opposed to here, the mother "had significantly distanced herself from" her abuser, had "recogniz[ed] he was a negative influence," had lived separately from him for eight months, did not invite "or otherwise encourage[] his presence" at her visits with the children, had "rejected" his appearances at her visits, had "refused even his offer to provide food for the kids," "was aware of how to protect her kids and if [he] were to harass her in the future [she] would either call the police or obtain a temporary restraining order," had "become independent," and "regained financial control of her income and arranged for her own housing." (*Id.* at pp. 150–151, 156–157.)

Here, on the other hand, Mother stated at the beginning of this case that she "plans to live with [Father]" when the CPO is lifted. Even a few

18

weeks before the November 2022 jurisdiction and disposition hearing, Mother reported being "sad" that Father fled to Mexico. The Agency noted that Mother was in "her early stages of treatment" to address domestic violence, while her family support clinician assessed her to be in the "contemplation" stage of change. Mother still struggled to identify how domestic violence dynamics and trauma affected her relationships and Z.T. Thus, the court was appropriately cautious about returning Z.T. to Mother's custody where Mother was far from showing "signs of real progress." (*In re I.B.*, *supra*, 53 Cal.App.5th at p. 156.) As the *I.B.* court noted, "[s]tudies have found that many abuse survivors attempt to leave a violent relationship *five to seven times* before they are able to fully do so." (*Ibid.*)

Indeed, there is substantial evidence supporting the court's finding that Mother is "vulnerable" and "has not yet gained the strength or insight" to protect Z.T. When Mother stopped taking her medication and experienced severe mental health crises, maternal family members got her medical assistance. She had a psychiatric hospitalization in March 2022 following a mental breakdown and because she was carrying a large knife around the house. She had previously been hospitalized involuntarily following aggressive and violent behavior at Z.T.'s birth. When not taking her medication, Mother neglected Z.T.'s hygiene, overfed her and smoked marijuana in her presence. She also allowed Z.T.'s clothing, crib, and booster chair to become infested with cockroaches and moldy. In September 2022, maternal grandmother arranged to fumigate Mother's room after having cleaned it for her an " 'infinity of times.' "

Mother also self-medicated with marijuana and left marijuana lying around her room where Z.T. could access it. Until the Agency became involved, Mother smoked marijuana in her bathroom while Z.T. was in the

19

bedroom. Then, she began smoking marijuana outside the home even though her doctor advised her of "the critical importance of stopping cannabis use as it is likely contributing to her symptoms." Mother's treating physician during her March 2022 involuntary hospitalization also noted that her prognosis was "contingent upon abstinence from drugs and alcohol and adherence to aftercare recommendations and medications."

Mother argues substantial evidence does not support the trial court's finding that there were no reasonable means to protect Z.T.'s physical health without removing her from Mother's physical custody. We disagree. The court "may consider past events in deciding whether a child presently needs the court's protection." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165; *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169 [we may consider "past events" in determining whether a child "is in present need" of protection].) Against the Agency's advice, Mother and maternal grandmother repeatedly violated the CPOs while Mother was living in maternal grandmother's home. Mother also chose to call Father to the hospital in November 2021 while she was giving birth and decided to resume a relationship with him in February 2022 when he was released from jail.

Mother argues that the "safety plan" that had been "fully implemented by the family" is evidence that reasonable means existed to protect Z.T.'s physical health without removing her from Mother's custody. But Mother was required, and failed, to present a plan demonstrating *her own ability* to protect Z.T. (§ 361, subd. (c)(1)(B) ["Allowing a nonoffending parent . . . to retain physical custody as long as that parent . . . presents a plan acceptable to the court demonstrating that . . . she will be able to protect the child from future harm."].) She also repeatedly refused to cooperate with people

attempting to help her, including the social worker, and repeatedly downplayed her marijuana usage and Father's domestic violence.

As the court found, "this is not about [maternal grandmother]." It is about "the still very vulnerable mother" who is "not yet" able "to protect herself or [Z.T.] sufficiently." It is also about "an abusive man" with "a long history of domestic violence" and "no regard for court orders." Father refused the Agency's offer to participate in voluntary services, take a drug test or develop a safety plan. Even so, Mother was focused on protecting him and initially denied any domestic violence ever occurred in their relationship. As the court explained, maternal relatives "cannot be there all the time" to protect Mother and Z.T. (See, also, *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 694 ["[t]he very concept of monitored visitation is fundamentally incompatible with around-the-clock in-home contact that necessarily includes periods when the designated monitor will be unavailable to perform his or her protective function."].) In fact, Mother was residing at maternal grandmother's home in July 2021 when she was pregnant with Z.T. and Father viciously attacked her in the front yard. Accordingly, the court concluded that it was not yet safe for Z.T. to reside with Mother in maternal grandmother's home.

In summary, substantial evidence supports the juvenile court's findings, under a clear and convincing standard, that there would be a substantial risk of danger to Z.T. if she were returned to Mother's custody, and that there were no reasonable means other than removal from Mother's custody to protect Z.T.

## DISPOSITION

The juvenile court's dispositional order is affirmed.


BUCHANAN, J.

WE CONCUR:


HUFFMAN, Acting P. J.


KELETY, J.